[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This action was brought by the plaintiff husband against the defendant wife for dissolution of their marriage on the ground of irretrievable breakdown.
The parties were married in Nigeria in December of 1992 in a CT Page 179 traditional cultural ceremony. The parties were married again in a civil ceremony on January 18, 1994, in Nigeria. After the defendant moved to the United States in 1994, the parties had a church wedding in Bridgeport, and in May, 2000, the defendant became a citizen.
There are three minor children issue of the marriage: Chioma Oguagha born May 31, 1996; Amado Oguagha born June 13, 1997; and Uchenna Oguagha born May 1, 1999.
The parties appeared at trial and each testified. The court observed their demeanor and evaluated their credibility. In addition, the court reviewed and considered the exhibits, sworn financial affidavits, claims for relief and proposed orders, and trial memoranda. Based upon the evidence, the court makes the following findings.
This action was commenced on November 16, 2000. The court has jurisdiction and all statutory stays have expired. The marriage has irretrievably broken down and judgment may enter dissolving the marriage on this ground. The plaintiff is 43 years of age and, except for some occasional episodes of high blood pressure, is in good health.
The plaintiff moved to the United States in January, 1980. In 1994, when the defendant moved here to join the plaintiff, she had virtually no belongings. At this time, the plaintiff owned some personal property, a car, had a small 401k account at Fleet Bank, and a small amount of debt.
The defendant is 37 years of age and in good health. The plaintiff husband, prior to the defendant coming to America, received a Bachelor of Science degree in accounting at the University of Bridgeport and a Masters in Business Administration at the University of New Haven. The defendant wife earned a teaching degree in Nigeria and, after moving to the United States and while in charge of care of her three young children and also working, has been enrolled in college and will receive her degree this spring and will enter a nursing program-for a Registered Nurse degree beginning September, 2002.
The plaintiff husband has worked primarily as a financial consultant and commission salesman of securities. He is presently employed by Morgan Stanley, and commencing May, 2002, his compensation will be based solely on commission. His earnings have fluctuated, with his reported earnings, as shown on his income tax returns, as follows: in 1997 of $59,650; in 1999 of $51,071; and in 2000 of $48,900. The defendant has held various jobs in an effort to help support her family and to provide for many of her own necessities and for her education. Presently, she is employed as a health aide earning $375 per week gross, $316 per week net. Upon completion of her nursing degree, she expects to have greater earnings. CT Page 180
Finances during the marriage were controlled by the plaintiff husband. Based on his belief that, as provider of most of the income for the family, he was entitled to control of spending, he kept total charge of the payment of all bills, borrowing, purchases, and effectively every aspect of the finances of the parties. He did so without consulting or advising the defendant and for the most part kept her totally in the dark. Despite the plaintiff's financial training and work experience, his recurrent and excessive borrowing, including the use of cash advances on credit cards and other borrowing to pay interest on outstanding obligations and accounts, have placed this family in their present dire financial situation. There is a combined balance of approximately $176,000 on their first and second/homequity mortgages on the two family house in which they live. The price for this Bridgeport property, purchased in December, 1997, was $129,000. The purchase was accomplished with a $122,500 first mortgage, $4000 of loans from a relative, and only $1500 of the plaintiff's funds. Since the closing, the only improvements to the property have been the installation of two new bathtubs, painting, and the addition of ceiling fans. With these minor changes, the parties claim the property currently has a fair market value of $192,000. The second mortgage has a balloon payment of the full balance of $60,000 due in four years. No appraisal or expert testimony was provided at trial. The court does not place much value on the plaintiff's opinion because much of his testimony throughout the trial was incredible and evidenced a lack of truthfulness. The court concludes that based on the amount of the mortgage debt, the expenses of and income from and the other evidence produced concerning the property, that there is little, if any, equity.
The family's finances were also hurt by the plaintiff's failed business venture in 1998, exporting cosmetics to Africa. In this short lived endeavor, he lost approximately $40,000.
The parties' unrealistic financial expectations and excessive borrowing leave them in a situation where neither party can afford to continue ownership of the two family home in which the defendant and the children reside. There is a significant shortfall between the income from rent, presently $850 per month, and the monthly expenses for the first mortgage, second mortgage, taxes, W.P.C.A. and water bills, $833.75, $542.10, $309.25, $36.48, and $66.66 respectively. In addition there are and will be expenses for utilities, heat, and maintenance.
Each party requests the court to award them this. property. Each has provided unrealistic scenarios for financing the costs and expenses of their retention of the property. The plaintiff's proposal assumes, and would require, continuous occupancy of the apartment, uninterrupted CT Page 181 payments of rent by the occupant, no extraordinary expenses for maintenance or repair, and a contributing roommate to defray costs.
The defendant's proposal assumes, in this time of high unemployment, finding a new job with better pay and additional overtime. This new job, overtime and schooling would all have to be integrated with the time required for her care of her three young children. In addition, she would have to locate a tenant for the apartment willing to pay 17 percent more than the present rent of $850, i.e. $1,000 a month, and find a tenant for the garage on the premises. Her plan would require that there be no vacancies and that all rent payments be made without interruption. She would also have to reduce her regular expenses of the household, and, for one of her proposals to accomplish this reduction, locate funds to convert the two family house from gas heat to oil heat. Her proposal fails to make provision for any extraordinary maintenance or repair expenses.
Unfortunately, most, if not all, of these items are, to a large extent, beyond the parties' control. During the term of this marriage, with both working, the parties were unable to keep pace with their financial obligations and were forced, repeatedly, to borrow to pay their bills. Although the defendant's earning capacity will likely increase after she obtains her nursing degree, this occurrence is some two years away. The plaintiff's earnings and earning capacity, based upon his education, training, and earnings history, will likely not be adversely affected by the change to a straight commission arrangement in May, 2002. With all these factors considered, it is clear that neither of the parties, can afford to keep the 115 — 117 Overland Street, Bridgeport, property.
The parties have reached an agreement on issues relating to care, custody and parenting of the children. A stipulation dated November 28, 2001, was filed with the court at trial and provides that the parties will share joint legal custody of the three minor children, Chioma Oguagha, Amado Oguagha, and Uchenna Oguagha, with primary physical custody to the defendant wife, the plaintiff husband will have reasonable rights of visitation upon reasonable notice to the defendant wife, and the plaintiff husband will be responsible for all pickup and drop off for the visitation, which pick up will be at curb side. The court approves the agreement and enters orders in accordance therewith.
The parties blame each other for the breakdown of the marriage. While cultural differences appear to have played a role in the problems which developed after the parties' marriage and settling in the United States, the plaintiff's emotional and physical abuse of the defendant, and at times of the children, was the predominant factor in the breakdown of CT Page 182 this marriage. This behavior began immediately after their move to Connecticut and became progressively worse. The plaintiff exhibited a total lack of affection, respect or concern for his wife and a consistent disregard for the emotional and financial needs of the family.
 ORDERS
The court has carefully considered the criteria set forth in General Statutes §§ 46b-81, 46b-82, 46b-84, and the applicable case law in reaching the decisions reflected in the orders that follow.
1. The marriage of the parties having broken down irretrievably is hereby dissolved.
2. Custody of the three minor children shall be as hereinbefore set forth.
3. The plaintiff shall continue existing medical coverage for the benefit of the children for so long as he is responsible for their support. Medical expenses for the children that are unreimbursed by insurance shall be paid by the parties in accordance with the Child Support Guidelines recommendations, i.e., 61 percent by the mother and 39 percent by the father. As to shared unreimbursed medical expenses for the minor children, the defendant shall pay her portion directly to the provider at the point of service.
4. If and to the extent the defendant is entitled to continuation of coverage under the plaintiff's group medical plan, the defendant shall be entitled to continuation of her current coverage under said plan, at her expense, for the maximum period allowed by law. In such event, the plaintiff shall cooperate with and provide all necessary assistance for the defendant's continuation of said coverage under COBRA.
5. ALIMONY AND CHILD SUPPORT. The plaintiff shall pay to the defendant, as unallocated alimony and child support, the sum of $290 per week and 39% of qualifying child care expenses as defined in the Child Support Guidelines from the date of this decision through February 28, 2006. Commencing March 1, 2006, the plaintiff shall pay to the defendant child support, child care expenses, and unreimbursed medical expenses all in accordance with the Child Support Guidelines. The Child Support Guidelines provide for a current base payment in the amount of $211 per week plus $82.00 per week plus 39% of unreimbursed medical expenses and 39% of qualified child care expenses. A deviation from the recommended amount is appropriate as part of a coordination of total family support, and it would be inappropriate and inequitable to follow the guideline figures in this situation. An immediate wage withholding CT Page 183 order shall enter for the alimony and support payments.
6. The court also finds an arrearage in the amount of $255 for the plaintiff's failure to pay unreimbursed medical expenses and the plaintiff is ordered to pay said arrearage at the amount of $42.00 per week until said sum is paid in full.
7. LIFE INSURANCE. The plaintiff husband shall maintain in effect the life insurance policy provided by his employer as set forth on his financial affidavit, naming the defendant wife as trustee for the minor children, until the children have all reached the age of majority. The plaintiff shall retain his Universal Life Insurance policy as set forth on his financial affidavit. The plaintiff husband shall provide annual proof that the aforementioned policies are in effect with coverages and beneficiary designation as set forth, and shall also provide evidence of the payment of premiums.
8. DIVISION OF ASSETS — 115-117 OVERLAND AVENUE, BRIDGEPORT, CT The real estate located at 115-117 Overland Avenue, Bridgeport, Connecticut, shall immediately be listed for sale with an asking price of $192,000, the value of the property as provided on the plaintiff's financial affidavit, or at such other price as the parties shall otherwise agree. The parties shall file with the court a statement, on or before January 24, 2002, with the name of the agent with whom the property is listed and shall provide a copy of the listing agreement. In the event that a listing agreement has not been executed by January 23, 2002, the parties shall appear before the court, at short calendar, on January 24, 2002, with the names of proposed realtors and the court shall select the realtor with whom the property shall be listed and issue orders to effectuate said listing.
 Both parties shall make every reasonable good faith effort to market and sell the property and shall cooperate regarding the same. The defendant's cooperation shall include, but is not limited to the following: cooperating with the broker, at the broker's direction, to prepare the property for sale, to allow a lockbox to be placed on the premises, to cooperate with showings of the property at the direction of the broker, and to take whatever action is reasonably requested by the broker.
 The parties will adhere to the broker's recommendations with reference to the lowering of the purchase price or asking price if such is necessary.
 Upon the sale of the property, from the proceeds shall be paid the customary and ordinary costs associated with the sale of real estate, CT Page 184 including brokers' commissions, attorneys' fees, conveyance taxes, and any mortgages and liens on said property as shown on the plaintiff's financial affidavit.
 The defendant shall vacate the home on or before the date of the closing of the sale. Up to and through the date of closing, the plaintiff shall be entitled to all rental payments from the tenant on the premises and shall be responsible for payment of both the first and second mortgages on said property and for maintenance and repairs of the exterior and structure of the building. No rent shall be due or required from the defendant. The defendant shall be required to pay for all utilities, heat, and ordinary maintenance for her apartment. Any extraordinary repairs for the apartment which may be required, i.e. repairs with a cost in excess of $250, shall be paid by the plaintiff and reimbursed from the net proceeds of the sale, if sufficient funds are available after payment of mortgages and all reasonable, ordinary and necessary closing expenses.
 After the payment of the ordinary costs associated with the sale of the property, as heretofore described, the net proceeds shall be divided one third to the plaintiff and two thirds to the defendant. The court shall retain jurisdiction over any issues relating to or arising from the listing and sale of this property. The plaintiff shall accept any offer within five percent of the listing price.
 The plaintiff husband shall not, as of the date of this decision, withdraw any further monies on or from the second mortgage/home equity loan if such is available.
9. RETIREMENT ACCOUNTS. The defendant shall receive the two retirement accounts as set forth in the husband's financial affidavit. The plaintiff shall pay and execute any documentation necessary to accomplish this transfer, and the plaintiff shall be responsible for the preparation and cost of any said document. The court shall retain jurisdiction to resolve any disputes with respect to this transfer. To the extent necessary, the plaintiff husband shall provide and pay for the cost of any Qualified Domestic Relations Order (QDRO) in order to effectuate the provisions of this paragraph.
10. PERSONAL PROPERTY. The defendant shall have title to, and the right to possession of, all the contents of the marital home except for the plaintiff's personal belongings, weight lifting equipment, clothing, computer, grill, records, photo albums, pictures, books, and safe. Tools, lawn maintenance and snow removal equipment shall remain on the premises as the property of the defendant in order to maintain the property; and in the event the property is sold, these items shall be CT Page 185 divided equally. In the event that there is any dispute over items of personal property, the matter shall be referred to the Family Relations division for personal property mediation before the matter is submitted to the Superior Court.
 Each party shall keep those motor vehicles which are currently listed on their financial affidavits without any claim or demand by the other. Each will be solely responsible for insurance and maintenance of their respective motor vehicles, and each will hold the other harmless from any claim or demand arising out or payment for or ownership of their respective motor vehicles. The parties shall retain their respective remaining assets as set forth on their financial affidavits.
11. LIABILITIES. Each party shall pay his or her own liabilities as set forth on the individual's financial affidavit and each party shall be responsible for his or her own attorney's fee.
12. TAX EXEMPTIONS. The parties shall split the exemptions for the minor children, with the defendant entitled to two exemptions and the plaintiff to one, until such time as there are two exemptions when the parties shall then each claim one child, until such time as there is only one exemption when the parties shall alternate said exemption.
HILLER, J.